E-FILED
Monday, 24 April, 2017 03:28:22 PM
Clerk, U.S. District Court, ILCD

IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| TANYA HARBECK,<br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | Case No. 1:15-cv-01455-JES-JEH |

**Report and Recommendation**

Now before the Court are the Plaintiff, Tanya Harbeck's, Motion for Summary Judgment (D. 7)[1] and the Commissioner's Motion for Summary Affirmance (D. 14). Both parties have submitted supporting memoranda thereto. (D. 8; 15). This matter has been referred to the Court for a Report and Recommendation. For the reasons stated herein, the Court recommends that the Plaintiff's Motion for Summary Judgment be DENIED, the Defendant's Motion for Summary Affirmance be GRANTED, and this matter be TERMINATED.

**I**

In July 2007, Harbeck filed an application for Disability Insurance Benefits (DIB) alleging disability beginning on February 20, 2006. Her claim was denied initially and upon reconsideration. Harbeck requested a hearing before an Administrative Law Judge (ALJ) and appeared before ALJ David Thompson in September 2009, represented by counsel. ALJ Thompson later found that Harbeck retained the residual functional capacity (RFC) to perform a range of light work as

---

[1] Citations to the Docket in this case are abbreviated as "D. __."

1

defined by agency regulations, concluding that she was not disabled. (D. 4 at pp. 20-36). Harbeck filed a civil action in this Court, pursuant to 42 U.S.C. §§ 405(g). After stipulation by both parties, the Court remanded the case to the Commissioner in June 2012 for further review. (D. 4-2 at pp. 272-75).

After a second hearing, ALJ Thompson issued another decision in September 2013, denying Harbeck's claim. *Id.* at pp. 288-310. Harbeck sought review and the Appeals Council remanded the case to a different ALJ, Diane Flebbe. (D. 4-3 at pp. 3-5). Harbeck appeared with counsel before ALJ Flebbe at a third hearing in February 2015. (D. 4-2 at pp. 195-244). Later that month, ALJ Flebbe issued a decision concluding that Harbeck was not disabled. *Id.* at pp. 136-157. The Appeals Council denied Harbeck's request for review in February 2015, making ALJ Flebbe's Decision the final decision of the Commissioner. 20 C.F.R. § 404.981. Harbeck filed the instant civil action, seeking review of ALJ Fleebe's Decision pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) in November 2015. (D. 1).

## II

At the time Harbeck applied for DIB, she was 30 years old. She was living in a home, in Bloomington, Illinois with her husband, who earns income. Harbeck has a bachelor's degree but has not worked since August 1, 2007. On the various SSA forms she submitted, Harbeck indicated that she has disabling fibromyalgia and depression. She alleges her disability began on February 20, 2006.

At the most recent hearing before ALJ Flebbe, Harbeck testified that while she is overweight, it did not impact her struggles with fibromyalgia and depression between February 20, 2006—the date she alleges her disability began—and December 31, 2007—the date she was last insured. (D. 4-2 at pp. 202-03).

In May 2006, Harbeck had her gallbladder removed. Before that surgery, she did not have any chronic pain. After gallbladder surgery, however, Harbeck developed extreme pain in her abdomen and upper chest. Harbeck said the pain

2

was constant, making it difficult for her to sit, stand, or move from either position. Her doctors treated her pain with medication, concluding that the pain was likely caused by fibromyalgia. Harbeck acknowledged that the medication helped decrease her pain.

Harbeck also said her doctors told her she needed to practice better sleep hygiene. On their advice, she attempted to sleep at a consistent time daily and set alarms to remind her to take some of her medications—because she had difficulty remembering to take them. Her doctors also advised her to exercise regularly. Harbeck did none of these things consistently, for reasons she cannot explain.

For three months after her gallbladder surgery, Harbeck says she could not leave her house. She remembers that she was stuck in her house due to pain, but cannot recall how much of her problems during that time were due to fatigue. As for her depression, Harbeck stated that she struggled with episodes of depression since 1998. She said it became worse in the wake of her surgery. This included "death thoughts" but she did not recall if it included any anxiety. (D. 4-2 at pg. 206).

Since at least 2007, Harbeck has also struggled with memory loss. While she was working her last job, she could not remember which days she was supposed to be at a particular job site and accidentally mixed up client files. After one particular client file mix up, Harbeck resigned from her position. During this last stretch of employment, she was working approximately five days a week, between four to five hours per day. She did not take any extra breaks during work. Harbeck said the working conditions led to an increase in her symptoms, namely pain and fatigue. She began to have trouble walking and was tired more often. Harbeck would spend her days off recovering from work and spoke with a doctor about her struggles. She confirmed that one of her physicians, Doctor Christopher Ring, recommended that she work less often. Harbeck's work schedule was

limited to no more than two work days in a row, but she saw no subsequent improvement in her condition before quitting.

Since her surgery, Harbeck said she cannot tolerate more than five to six minutes of continuous physical activity. Anything beyond that requires her to lay down in order to recover. With the increased pain and need for substantial recovery time, Harbeck said she was no longer able to cook or do basic chores around the house. She asserts that this exacerbated her depression, and her decreased mobility, in turn, led to an increase in her weight. During the relevant timeframe, Harbeck said she spent approximately four hours per day on her computer, mainly conducting genealogy research, one of her hobbies.

Harbeck admitted to the ALJ that within the limitations noted above, she could cook, clean, and take care of her basic hygiene needs. Her husband, however, had to do the laundry, sweeping, and bathroom cleaning, exclusively. Harbeck testified that she did sometimes grocery shop. For more extensive shopping trips, she would use an electric scooter to get around the store. If she only needed to retrieve a few items, she would walk unassisted.

Harbeck has been able to travel during the relevant time period. Notably, in the summer of 2007 she drove to Reno, Nevada with her husband. Harbeck said she did approximately two hours of driving over the course of two days and her husband did the rest. They were gone for approximately one week. Aside from going to a buffet to eat once and possibly visiting a gift shop, Harbeck said she stayed in bed at her hotel room during the entire trip. Outside the relevant time period, in 2009, she travelled to St. Louis to attend a concert.

Vocational Expert, Dennis Gustafson, also testified at Harbeck's hearing. Based on Harbeck's testimony, Gustafson concluded that the only past relevant work history Harbeck had was two months spent working as a cashier. He stated that Harbeck could perform sedentary and light work that is detailed, but

uninvolved, with some limitations—specifically, no climbing ladders, ropes, or scaffolding with only occasional balancing, stooping, kneeling, crouching, or crawling. Gustafson said that Harbeck would not be able to perform any of her past work. He opined that Harbeck could, however, perform some unskilled manual jobs and sedentary jobs normally found in manufacturing. Gustafson provided approximate figures for the availability of some of these types of jobs, both in the state of Illinois and nationally. Gustafson also stated that someone with Harbeck's limitations would also be able to perform jobs involving simple, routine, and repetitive tasks with no interaction with the public and only occasional interaction with coworkers and supervisors.

Gustafson said that if an employee were to miss two days or more of work every month, they would likely lose their employment on the basis of inadequate productivity. Additionally, he said the result would be the same if they were able to make it to work every day but were off task approximately fifteen percent of the time. Gustafson stated that his testimony was consistent with the information found in the Dictionary of Occupational Titles (DOT) and that the portions of his testimony not specifically addressed by the DOT were based on his professional experience.

In closing, Harbeck's counsel argued that Harbeck was unable to sustain any form of competitive employment due to her combined impairments.

### III

In her Decision, the ALJ determined that Harbeck had the severe impairments of periodic limb movement disorder, fibromyalgia, obesity, depression, and anxiety disorder. (20 CFR 404.1520(c)). (D. 4-2 at pg. 138). She further determined, however, that through Harbeck's last date insured, Harbeck "did not have an impairment or combination of impairments that met or medically

5

equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." *Id.* at 139.

The ALJ noted that periodic limb movement, fibromyalgia, and obesity are not listed impairments. She provided a lengthy chronological analysis of Harbeck's medical records, including her visits to mental health professionals. *Id.* at pp. 139-49. She noted that certain physicians documented that fibromyalgia was a probable explanation for Harbeck's pain symptoms. It was not, however, deemed to be the sole cause. Doctor Eric Duncan, to cite one example, suspected an underlying sleep disorder and stated that treating it would help ease Harbeck's fibromyalgia. *Id.* at pg. 140. Harbeck was advised repeatedly of the importance of diet and exercise in relation to her health. Harbeck was referred to physical therapy as well, but did not follow through on that recommendation. *Id.* at pg. 143.

In October 2007, Harbeck had a fifty minute session with Tim Shannon, Psy.D. The ALJ noted the following after reviewing Shannon's records from this visit:

> Her affect was positive at the beginning of the session; she said that she felt that she was doing fine and nothing was really bothering her, "and she talked about her continuing goal to get disability." Dr. Shannon noted, "during the session, I asked her if she was willing to do things in order to try to get better as opposed to not trying to get better; when I asked her this question, she became very angry and defensive and began crying; she cried for the rest of the session." She reported sleep problems but stated that she napped often during the day; "in fact, she stated that she only stays awake for about two hours and then falls asleep." She stated that she spent most of her time sleeping, sitting on the couch watching television, or playing on the computer. She "reported that she really does not do much in order to help with her depressive symptoms.["] "She reports that she feels that that [*sic*] 'not working, watching TV or being on the computer are helpful with making me less depressed'; this statement seemed odd as this is how she spends much of her time now and she reported that

> she is very depressed. Dr. Shannon stated, "the patient had a very clear agenda to gain disability benefits for not working; she discussed anger at previous therapists for not supporting her in filing for this claim." She reported that in 1996, her mother acquired disability following a car accident and she reported that following that she knows how to file her own disability claims. Dr. Shannon noted that her "symptoms seemed vague and it was unclear as to whether they were really caused by any medical problems or not." She reported "a history of trying to get medical doctors to write notes for her in order to limit her work schedule and she reported that she had seen at least 15 different doctors in the last year and she said that she has easily seen 50 or more doctors in the last 10 years in order to work on her alleged physical symptoms." When Dr. Shannon asked what he could do to help with her depression, "she stated that I could help her to acquire disability benefits; this intensified my theory that she came in here in order to do exactly what she stated and that was to work on getting a disability claim as opposed to trying to get better with her symptoms of depression."

*Id.* at pp. 145-46 (*quotations in original*).

The ALJ found that the severity of Harbeck's mental impairments, individually and collectively, did not meet the criteria required to support a finding of disability. She explicitly stated that "[i]n making this finding, the undersigned has considered whether the 'paragraph B' criteria were satisfied." *Id.* at pg. 148. The ALJ went on to specify the criteria and delineate multiple instances where Harbeck's behavior demonstrated that it did not meet the applicable standards.

> The ALJ crafted the following Residual Functional Capacity for Harbeck:
>
> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except: she could not climb ladders, ropes, or scaffolds; she could not kneel, crouch, or crawl; she could occasionally climb ramps/stairs, balance, and stoop; and she was limited to simple, routine, and repetitive work with no work interaction with the

7

general public and only occasional work interaction with coworkers and supervisors.

*Id.* at pg. 150. In reaching this finding, the ALJ considered all of Harbeck's testimony and the evidence documenting her symptoms, "in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." *Id.* Following protocol, she determined there was a medical impairment reasonably expected to produce Harbeck's symptoms. The ALJ further found, however, that in evaluating the intensity, persistence, and limiting effects of Harbeck's symptoms, they "are not supported for the period of time at issue[.]" *Id.* at pg. 152.

After considering all of these factors, the ALJ found Harbeck's "claims of extremely limited functional capacity are not demonstrated by the medical records." *Id*. She emphasized that, based on the record, Harbeck's compliance with treatment instructions was questionable. The ALJ supported this assertion by citing instances memorialized in Harbeck's medical records, concluding that Harbeck "was not compliant with treatment recommendations. She did not follow the advice to practice better sleep hygiene… or stop eating junk food. She also did not take her prescription medication consistently despite reporting that it helped her when she took it." *Id.*

The ALJ further detailed Harbeck's inconsistent actions. For example, although Harbeck testified at her first hearing that she could not sit for more than ten minutes continuously, she also testified that she drove for over three hours to get to the hearing that day and only took a five minute break. *Id.* at pg. 153.

The ALJ also specifically addressed Harbeck's numerous Global Assessment of Functioning (GAF) scores. She concluded that while Harbeck's GAF scores were consistently low, she did not accept them because they were

"clearly not consistent with her functioning at the time[]" or the doctors' mental status evaluations. *Id.*

The ALJ addressed medical records from Doctor Christopher Rink in her Decision. She noted that Rink initially stated in June 2007 that he did not know what, if any, work restrictions Harbeck needed. The next month, however, he indicated that her work schedule should be limited to four work days per week and no more than two of those days consecutive. The ALJ stated that:

> [s]ince her physical exam did not change significantly during this time, a limitation to part time work appears to be offered based on the claimant's subjective complaint that she could not work five days in a row and was too tired. As this is not Dr. Rink's independent medical opinion based on clinical evidence of decline in the claimant's impairments, it is given no weight.

*Id.* pg. 154. In conclusion, she found that even if Harbeck could only sustain her last job on a part-time basis, "the claimant's noted concerns over the physical and mental demands of this work are addressed in the residual functional capacity above by reducing her to less than a full range of sedentary work with only simple, routine and repetitive work tasks and limited social interactions." *Id.*

The ALJ similarly dismissed Duncan's conclusion that Harbeck would miss more than three days of work in a given month. She stated that Rink's and Duncan's opinions "over time, provide greater restriction to the claimant's work yet do not cite to significant worsening of her impairments to support these restrictions. The undersigned considers these unsupported opinions in light of the assessments of Shannon, who also treated the claimant during this period of time." *Id.* The ALJ went on to again recount Shannon's observations as discussed previously, ultimately finding that Harbeck was not disabled.

## IV

Harbeck argues that the ALJ erred in: (1) evaluating the severity and limitations stemming from her fibromyalgia; (2) reevaluating opinion evidence; (3) assessing her subjective complaints; (4) reconsidering her maximum RFC; and (5) finding that she can perform one of her past jobs.

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. §§

404.1520, 416.920. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. "A negative answer at any point, other than at step 3, stops [the] inquiry and leads to a determination that the claimant is not disabled." *Garfield v. Schweiker*, 732 F.2d 605, 607 fn. 2 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. In the instant case, Harbeck claims the ALJ erred at Steps Three, Four, and Five.

**A**

First, Harbeck argues the ALJ erred in evaluating the severity of her fibromyalgia and the limitations stemming from it. (D. 8 at pp. 7-8). Most notably, she argues that the ALJ violated SSR 12-2p by stating that fibromyalgia is not itself listed as an impairment and claims the ALJ "cherry picked bits of optimistic news from the medical records[.]" *Id.*

11

SSR 12-2p provides that the SSA will only find a person is impaired by fibromyalgia if there is (1) a history of widespread pain throughout the body which persists for at least three months—allowing for the pain to fluctuate in intensity; (2) at least 11 out of 18 possible positive tender points are present upon physical examination; and (3) evidence that other disorders were excluded as possible causes of the pain at issue. SSR 12-2p at pp. 2-3. The ruling itself acknowledges that fibromyalgia is not listed as an impairment. *Id.* at pg. 6.

Harbeck has not put forth sufficient evidence to support her a claim that the ALJ violated SSR 12-2p. Most notably, as discussed by the ALJ, is the potential for another underlying cause to contribute to Harbeck's pain. According to the record, she has problems stemming from a sleep disorder, poor diet, and lack of exercise. It appears, unfortunately, that Harbeck was unwilling or unable to address these issues. As such, they were not be eliminated as a potential contributing factor to her pain during the time at issue.

In short, Harbeck points to nothing in the record to establish that the SSA should have confirmed her fibromyalgia was debilitating. The record clearly indicates that Harbeck's physicians strongly suspected her sleep disorder and lifestyle choices were a contributing factor to her pain. Thus, the ALJ did not violate SSR 12-2p.

### B

Next, Harbeck argues the ALJ erred in reevaluating opinion evidence, in violation of the Remand Order. (D. 8 at pg. 8-11). She makes this assertion without further reference to the Remand Order. Instead, Harbeck argues the ALJ's Decision "disregards both the treating physician rule and guidelines set out in SSR 12-2p regarding fibromyalgia." *Id.* at pg. 8. Harbeck asserts that the ALJ's "preoccupation with objective medical evidence is again evidence of a failure to

properly adhere to SSR 12-2p. Once Fibromyalgia is determined to be severe, no further objective evidence is required. SSR 12-2p." *Id.* at pg. 9.

The Court's analysis of the ALJ's compliance with SSR 12-2p remains unchanged in the wake of Harbeck's additional claims on this issue. There is nothing in SSR 12-2p supporting Harbeck's assertion. In fact, the opposite is true. *See e.g.* SSR 12-2p at pg. 2 ("As with any claim for disability benefits, before we find that a person with an [impairment of fibromyalgia] is disabled, we must ensure there is sufficient *objective evidence* to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantially gainful activity.") (*emphasis added*). Accordingly, the Court need not further address Harbeck's arguments on this point.

As for the treating physician opinions, Harbeck argues that the ALJ rejected Rink's and Duncan's opinions improperly. (D. 8 at pg. 9). Though an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), *citing Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. §416.927(c)(3). If the ALJ does not give a treating physician's opinion controlling weight, the Social Security regulations require the ALJ to consider: 1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527; 20 C.F.R. § 416.927; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

The ALJ in this case considered all of the above factors in rendering her Decision. Her recount of Harbeck's relevant medical history was a comprehensive

13

summary, spanning ten single spaced pages. (D. 4-2 at pp. 139-49). Most importantly, the ALJ directly addressed the consistency and supportability of the physician opinions at issue. Rink opined that Harbeck was unable to work more than four days a week or for more than two consecutive days. Duncan concluded that Harbeck would miss more than three days of work per month. The ALJ did not err in failing to give their opinions controlling weight.

In the ALJ's discussion on Rink's opinion, she stated that it was unsupported by any change in Harbeck's physical condition. (D. 4-2 at pg. 154). She concluded that "[a]s this is not Dr. Rink's independent medical opinion based on clinical evidence of decline in the claimant's impairments, it is given no weight." *Id.* The ALJ emphasized the fact that Rink's finding was close in temporal proximity to his earlier, contradictory assessment that he saw no reason why Harbeck's work schedule should be limited. Rink's first assessment is important as it places his later finding in context. Viewed in this light, the ALJ's inferential leap that Rink's opinion was based solely on Harbeck's subjective complaints is not unreasonable.

Harbeck argues there was no change in assessment, and that Rink's earlier assessment was not an opinion, but rather a brief pause before he gave his final opinion a month later. In her view, "[e]ssentially, the ALJ discredited the doctor's opinion because he took some time to evaluate the Plaintiff's progression and make a more reasoned decision." (D. 8 at pg. 9). Harbeck's assertion is not supported by the record and directly contradicts the explicit reasoning provided by the ALJ in her Decision. Accordingly, Harbeck's argument on this point fails.

The ALJ also addressed Duncan's opinion that Harbeck would miss more than three days of work per month. She rejected the opinion, however, "as it is unsupported by the objective medical evidence, the conservative course of treatment, positive response to treatment when compliant, noting significant

14

noncompliance, with diet, recommendations to increase her activity and structure[,] and maintain a proper sleep schedule." (D. 4-2 at pg. 154). Thus, the ALJ articulated concrete reasons why she rejected Duncan's opinion.

The ALJ did not err in assigning little weight to Rink's and Duncan's opinions. In her Decision, the ALJ explained why she gave them little weight. *Id*. In her view, the opinions were unsupported and contradicted. The ALJ's reasoning is sufficiently supported by reference to evidence in the record. Accordingly, Harbeck's argument on this point fails on the merits.

Additionally, in this section of her argument Harbeck also attacks the ALJ's dismissal of her GAF scores. (D. 8 at pg. 10). She claims that the ALJ's emphasis on the fact that she was assessed with a GAF score of 40 while employed is misleading because her performance at work was "sub-par" at that time and she was about to lose her job. *Id*. at pg. 11. Harbeck's testimony only established that she made mistakes while working at the job at issue and eventually resigned. There is no indication in the record that she was going to be involuntarily terminated from her position. As such, the Court rejects this argument as it is unsupported.

## C

Next, Harbeck argues the ALJ erred in assessing her subjective complaints. *Id.* at pg. 11-12. Specifically, she claims that the ALJ's use of the phrase "'reportedly' diagnosed with fibromyalgia" and references to the fact that she traveled to St. Louis to attend a concert in 2009, demonstrate that the ALJ violated SSR 16-3p. *Id.* at pg. 11. Harbeck concludes "[n]o doctor has ever suggested that claimant's pain is not real, and the ALJ seems to have been requiring objective proof that simply cannot exist." *Id.* at pg. 12.

Harbeck's claims on this issue are inaccurate. While the ALJ did use the phrase "reportedly diagnosed" in her Decision, this is not *per se* evidence that she

15

harbored some form of prejudice against Harbeck. Nor is it proof she required Harbeck to submit objective proof of her fibromyalgia in order to be found disabled. In this context, the use of the phrase "reportedly diagnosed" is likely attributed to the fact that the ALJ presumed Harbeck had fibromyalgia and did not need to confirm it for herself by scrutinizing Harbeck's medical records further. This is an efficient means of assessing Harbeck's case.

The ALJ also addressed the fact that Harbeck traveled in 2009. In doing so, she appropriately commented that this behavior was inconsistent with Harbeck's claims of physical limitation. This too is not, as Harbeck suggests, an indication that the ALJ was predisposed to finding Harbeck un-credible or that she insists on having objective proof of her fibromyalgia diagnosis. Rather, this is a common sense observation in the wake of Harbeck's testimony. Regardless, this Court gives no weight to the underlying facts of this incident as they occurred outside of the relevant timeframe, in 2009. Any possible error the ALJ committed by referencing this activity is harmless, and outweighed by the remaining substantial evidence from the relevant time period which she cited in her Decision.

More to the point, the Court finds that the ALJ's finding is not contingent upon a determination of Harbeck's credibility. The ALJ did point out that Harbeck's professed physical limitations were inconsistent with some activities she testified to engaging in. Ultimately, however, she based her finding on Harbeck's testimony. She did not dismiss it, and hence, the limitations the ALJ placed on Harbeck's prospective working conditions.

Even if the Court were to presume the ALJ found that Harbeck lacked credibility, any credibility determinations she made would not be overturned unless the findings were patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and

that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."[2] An ALJ must provide "enough detail and clarity to permit meaningful review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). In other words, a credibility finding "must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

Just as the Court cannot re-weigh the medical evidence of record and resolve conflicts in the record, nor can the Court make its own credibility finding. "When assessing an ALJ's credibility determination, [the court does] not . . . undertake a *de novo* review of the medical evidence that was presented to the ALJ. Instead, [the court] merely examines whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). It is only when an ALJ's determination lacks any explanation or support that it is "patently wrong." *Id*. at 413-14. That is not the case here.

The ALJ noted reasons why she found Harbeck's testimony regarding her limited functional capacity inconsistent. (D. 4-2 at pp. 150-52). In addition to referencing Harbeck's decision to attend an out of town concert in 2009, she discussed other actions Harbeck took during the relevant timeframe. She concluded that Harbeck's "claims of extremely limited functional capacity are not demonstrated by the medical records." *Id.* at pg. 152. Thus, the ALJ included specific reasons for her finding of inconsistency, supported by evidence in the record. The ALJ confronted the objective medical evidence of Harbeck's impairments, her daily activities, and her treatment. In so doing, the ALJ provided

---

[2] SSR 96-7p was superseded by SSR 16-3p, effective March 16, 2016. The operative language the Court quotes here from SSR 96-7p, however, appears in SSR 16-3p verbatim. By either standard, the Court's analysis remains the same.

enough clarity and detail to permit meaningful review. The ALJ considered the contrary evidence and explained why she rejected it. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005) ("An ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record"). Therefore, the ALJ did not commit error in any potential credibility analysis she made which would require remand.

### D

Harbeck further argues the ALJ failed to properly reconsider her maximum RFC. (D. 8 at pg. 13). Specifically, she claims the ALJ did not adequately account for her mental limitations. Citing SSR 85-15, Harbeck asserts that limiting someone to "simple, routine, repetitive tasks does *not* accommodate that individual's limitations in concentration, persistence, or pace." *Id.* (*emphasis in original*). By her account, since the ALJ did not mention any of these factors while asking Gustafson hypothetical questions, that testimony is based on an inaccurate, incomplete representation of the facts. She does not, however, highlight any facts which the ALJ or this Court should have considered in the alternative.

While the ALJ did not directly discuss these factors with Gustafson at the hearing, she did address them in her Decision. She found that Harbeck had "moderate difficulties[,]" but was still able to read and conduct research. (D. 4-2 at pp. 148-49). The ALJ also noted that Harbeck performed well on relevant tests during her psychological consultative examination. *Id.* at pg. 149. She concluded that Harbeck had "deficits in concentration, persistence, or pace but fails to demonstrate these were more than moderate prior to her date last insured." *Id.*

Again, determinations of credibility made by the ALJ will not be overturned unless the findings are patently wrong. *Shideler v Astrue*, 688 F3d 306, 310-11 (7th Cir 2012). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."

*Sims v Barnhart*, 442 F3d 536, 538 (7th Cir 2006) (citation omitted). An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Scheck v Barnhart*, 357 F3d 697, 703 (7th Cir 2004); *Rice v Barnhart*, 384 F3d 363, 371 (7th Cir 2004).

Here, the ALJ provided very specific reasons for her finding. The ALJ laid out her rationale for finding that Harbeck's mental impairments were moderate. This included support from Harbeck's own testimony and results from objective medical tests. The ALJ made her finding only after she detailed much of the testimony and evidence earlier in her Decision. Her credibility determination was grounded upon observations that were both reasonable and supported in the record. *Sims*, 442 F3d at 538. The ALJ's findings are not patently wrong. *Skarbek v Barnhart*, 390 F3d 500, 504-05 (7th Cir 2004). Therefore, Harbeck's claim on this issue fails on the merits.

E

Last, Harbeck argues the ALJ's finding that she can perform one of her past jobs or other available work is premised upon a flawed evaluation of the vocational testimony. (D. 8 at pg. 14). Her basis for this argument primarily rests upon the contention that it was improper for Gustafson to provide the ALJ with only national and state job numbers, without any for her particular region. *Id.* This argument is not supported by citation to supporting authority. Local Rule 7.1(B)(1) requires litigants to support their arguments with supporting authority. Harbeck has failed to do so. As such, Harbeck forfeits the argument. The Court notes in closing, however, that regional statistics more precise than those from individual states are not automatically required. *See Gutierrez v. Commissioner of Social Security*, 740 F.3d 519, 526-27 (9th Cir. 2014) (citing *Barrett v. Barnhart*, 368

F.3d 691, 692 (7th Cir. 2004) and finding that a region may include an entire state for purposes of calculating job statistics in Social Security hearings).

V

For the reasons stated herein, the Court recommends that Harbeck's Motion for Summary Judgment (D. 8) be DENIED and the Commissioner's Motion for Summary Affirmance (D. 15) be GRANTED. Any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) working days after service of this Report. FRCP 72(b)(2); 28 USC § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v Zema Sys. Corp.*, 170 F3d 734, 739 (7th Cir 1999); *Lorentzen v Anderson Pest Control*, 64 F3d 327, 330 (7th Cir 1995).

*It is so recommended.*

Entered on April 24, 2017.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE